Peter J. Bezek (SBN 102310)
Roger N. Behle, Jr., Esq. (SBN 174755)
**FOLEY BEZEK BEHLE & CURTIS, LLP**
575 Anton Blvd., Suite 710
Costa Mesa, CA 92626
Telephone (714) 556-1700
Facsimile: (714) 546-5005
pbezek@foleybezek.com; rbehle@foleybezek.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTICANCER, INC., a California Corporation.<br><br>            Plaintiff,<br><br>    vs.<br><br>TECO DIAGNOSTICS, a California Corporation; KC CHEN, a natural person; TONG CHIAH, a natural person; JIAN YANG VAECHES, a natural person; and DOES 1 through 30, Inclusive,<br><br>            Defendants. | **CASE NO.: 07CV2294-L(BLM)**<br><br>Judge: M. James Lorenz<br>Magistrate: Barbara L. Major<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF ANTICANCER, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        July 21, 2008<br>Time:        10:30 a.m.<br>Courtroom:   14 |

TO ALL PARTIES AND THEIR ATTORNEY'S OF RECORD:

DEFENDANT, TECO DIAGNOSTICS ("Defendant" or "TECO")[1] hereby submits the

following Memorandum of Points and Authorities in Opposition to Plaintiff AntiCancer, Inc.'s

Motion for Partial Summary Judgment ("Motion"). Defendant's Opposition shall be based on

the existence of several genuine issues of material fact in the record before the Court, set forth

in detail below. Defendant's opposition shall also be based on the accompanying Memorandum

of Points and Authorities, the Declaration of KC Chen, the Declaration of Tong Chiah, the

Declaration of Jian Yang Vaeches, the Declaration of Roger N. Behle, Jr., the pleadings, files,

---

[1] The Motion purports to be against Defendant Teco Diagnostics only.

and records in this action and any such oral or documentary evidence that might be presented at the hearing on this matter.

Dated: July 3, 2008             FOLEY BEZEK BEHLE & CURTIS, LLP


                                s/Roger N. Behle, Jr._____
                                Roger N. Behle, Jr.
                                Attorneys for Defendants.

**TABLE OF CONTENTS**

Table of Contents------------------------------------------------------------------------------------3

Table of Authorities--------------------------------------------------------------------------------4

I.    STATEMENT OF RELEVANT FACTS-------------------------------------------------6

    A. Teco Diagnostics Has Never Manufactured Any Homocysteine Assay
       Testing Products-------------------------------------------------------------------------6

    B. Plaintiff and Teco Diagnostics entered into a Joint Venture Relationship,
       one Purpose of which was to Evaluate Plaintiff's Kit and the Market
       Potential for the Kit---------------------------------------------------------------------7

II.   APPLICABLE LAW------------------------------------------------------------------12

    A. Plaintiff has failed to Meet its Burden for Partial Summary Judgment--------------12

    B. Plaintiff has failed to Prove that Teco has Infringed Any of the
       Claims of the Patents-in-Suit---------------------------------------------------------13

    C. Teco has Not Admitted Patent Infringement-----------------------------------------14

    D. As a Matter of Law, TECO is Not Liable for Patent Infringement
       under the "First Sale Doctrine"-------------------------------------------------------16

    E. As a Matter of Law, TECO is Not Liable for Patent Infringement
       under the Doctrine of Implied License------------------------------------------------17

    F. As a Matter of Law, TECO's Flyer and Website Do Not
       Constitute Offers to Sell under 35 U.S.C. §271---------------------------------------19

III.  CONCLUSION----------------------------------------------------------------------20

# TABLE OF AUTHORITIES

### CASES

Adams v. Burke, 17 Wall. 453 (1873) ------------------------------------------------------15

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970) ----------------------------------12

Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1334, 1342 (S.D. Fla. 2003)-----19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)-------------------------------12

Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1350 (Fed. Cir. 2003) -------------------16

Bloomer v. Millinger, 68 U.S. (1 Wall.) 340, 350-51, 17 L. Ed. 581 (1864)----------------15

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).--------12

De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (U.S. 1927) ------------------16

Hobbie v. Jennison, 149 U.S. 355 (1893)--------------------------------------------------15

Intel Corp. v. ULSI Sys. Technology, 995 F.2d 1566, 1568 (Fed. Cir. 1993)----------------15

Intel Corporation v. Silicon Storage Tech. Inc., 20 F. Supp.2d 690, 696 (D.Del.1998) ---------18

Lucent Technologies, Inc. v. Newbridge Networks Corp., 168 F. Supp.2d 181, 229 (D. Del 2001) -----------------------------------------------------------------------------18

Rotec Industries, Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1255 (Fed. Cir. 2000) ----------------18

T.W. Elec.Serv. v. Pacific Electric Contractors Assoc., 809 F.2d 626, 630_631 (9th Cir. 1987)12

Unidisco, Inc. v. Schattner, 824 F.2d 965, 968, 3 USPQ2d 1439, 1441 (Fed. Cir. 1987), cert. denied, 484 U.S. 1042, 98 L. Ed. 2d 860, 108 S. Ct. 774 (1988) ---------------------------------15

United States v. Univis Lens Co., 316 U.S. 241, 252, 53 USPQ 404, 408, 86 L. Ed. 1408, 62 S. Ct. 1088 (1942)--------------------------------------------------------------------------15

VP Intellectual Properties, LLC v. IMTEC Corporation, 1999 U.S. Dist. LEXIS 19700, 1999 WL 1125204, 5-6 (D.N.J. Dec. 9, 1999)------------------------------------------------18

Wang Lab. v. Mitsubishi Elecs. Am., 103 F.3d 1571, 1579 (Fed Cir 1997)----------------------17

<u>STATUTES</u>

35 U.S.C. §271----------------------------------------------------------------------------------- 12, 17

<u>RULES</u>

Fed. R. Civ. P. 54(b) --------------------------------------------------------------------------11

Fed. R. Civ. P. 56(c) --------------------------------------------------------------------------11

## I.    STATEMENT OF RELEVANT FACTS

TECO is a worldwide manufacturer of medical tests and devices. TECO distributes its products in over 90 countries, including the United States. In August 2006, TECO approached AntiCancer, Inc. ("Plaintiff") to discuss a possible joint venture between the companies.[2] Specifically, TECO's project manager, Defendant TONG CHIAH ("Chiah") contacted Plaintiff on behalf of TECO to discuss Plaintiff's Homocysteine Assay kit ("the Kit").[3] TECO had already been selling another homocysteine assay test, manufactured by Catch, Inc.,[4] and was interested in adding a new test to its line.[5]

### A.    Teco Diagnostics Has Never Manufactured Any Homocysteine Assay Testing Products

Although TECO manufactures several of its own diagnostic products, it has never developed or manufactured its own homocysteine assay test.[6] Rather, Teco has acquired homocysteine assay testing products from third parties, such as Catch, Inc., under agreement with such third parties, which TECO then sells to its customers under the TECO DIAGNOSTICS brand.[7]

Specifically relevant to the present litigation is the fact that TECO has never developed or manufactured its own homocysteine assay test that uses any of the processes or methods that are used in the homocysteine assay test sold by AntiCancer, Inc., nor has it developed or

---

[2] Declaration of Tong Chiah ("Chiah Decl."), ¶4.

[3] Chiah Decl., ¶3.

[4] The homocysteine assay test sold by Catch, Inc. to TECO is covered by multiple *separate* U.S. patents granted and/or assigned to Catch, Inc.; Chiah Decl., ¶3. The Catch method utilizes the reaction of homocysteine and L-serine to form cystathionine catalyzed by cystathionine $\beta$ synthase (CBS). This is followed by the cystathionine $\beta$-lyase (CBL) catalyzed conversion of cystathionine to homocysteine, pyruvate and ammonia. The rate of pyruvate production can be measured by inclusion of LD and NADH in the reaction mixture and is directly proportional to the concentration of homocysteine.

[5] Chiah Decl., ¶3.

[6] Declaration of Jian Yang Vaeches ("Vaeches Decl."), ¶4.

[7] Vaeches Decl., ¶4.

manufactured any homocysteine assay test that utilizes a genetically-engineered enzyme.[8] Moreover, TECO has never made, used, sold, offered to sell, imported/exported, or licensed any homocysteine assay test (other than the homocysteine assay test manufactured by Catch, Inc., referenced above) anywhere in the United States or abroad.[9]

Homocysteine assay tests are "read" on machines called analyzers or "readers."[10] There are many different types and brands of readers on the market.[11] In selecting a particular homocysteine assay test for purchase, a customer must be certain to purchase only tests that can be applied to the particular reader they have in their office or lab.[12] Not all homocysteine tests can be applied to all readers.[13]

**B.     Plaintiff and Teco Diagnostics entered into a Joint Venture Relationship, one Purpose of which was to Evaluate Plaintiff's Kit and the Market Potential for the Kit**

A preliminary issue for TECO was whether Plaintiff's Kit could be applied to a reader manufactured by Beckman Coulter - the Beckman CX ("CX Reader").[14] The CX Reader was an automated reader, which meant that it could perform tests in less time than through the use of a manual reader. As a large number of TECO's customers used the CX Reader, TECO needed to know whether the Kit could be applied to that reader.[15] If it could, both parties stood to benefit from the sale of Plaintiff's Kit to TECO's customers.[16]

---

[8] Vaeches Decl., ¶5.

[9] Vaeches Decl., ¶6.

[10] Chiah Decl., ¶4.

[11] Chiah Decl., ¶4.

[12] Chiah Decl., ¶4.

[13] Chiah Decl., ¶4.

[14] Chiah Decl., ¶5.

[15] Chiah Decl., ¶5.

[16] Chiah Decl., ¶5.

Thus, the parties' initial discussions – and efforts – centered on a determination as to whether the Kit could be applied to the CX Reader.[17] By all accounts, this process could take up to a year to complete.[18] In fact, Dr. Robert Hoffman of AntiCancer, Inc. told TECO this was a "serious undertaking" that would take between 6 months to one year to complete.[19] TECO rightfully interpreted this comment to mean that the parties would be working together on the project at least through August of 2007. As part of this lengthy process, representatives from TECO traveled to San Diego to meet with Plaintiff's representatives, at which time Plaintiff's representatives "demonstrated" Plaintiff's Kit.[20] Thereafter, representatives from Plaintiff travelled to TECO's facilities in Anaheim, California to conduct preliminary testing alongside TECO representatives.[21]

A secondary issue was the market potential for Plaintiff's Kit internationally.[22] TECO had several international customers that it thought may be interested in purchasing Plaintiff's Kit.[23] In TECO's estimation, this market potential could be evaluated relatively quickly, as it did not require testing to apply the Kit to a new reader, such as the CX Reader.[24] Rather, the potential could be assessed using a manual reader Plaintiff had, which it purchased from a company called Opulen (the "Opulen Reader").[25] Although Plaintiff did not have 510(k)

---

[17] Chiah Decl., ¶6.

[18] Chiah Decl., ¶6; Deposition of Robert M. Hoffman ("Hoffman Depo."), V. I, p. 65, l. 24- p. 66, l. 9.

[19] Hoffman Depo., V.I., p. 65, l. 6-p. 66, l. 9.

[20] Hoffman Depo., V.I., p. 67, l. 25-p. 68, l. 24.

[21] Chiah Decl., ¶6.

[22] Declaration of KC Chen ("Chen Decl.), ¶7.

[23] Chen Decl., ¶8.

[24] Chen Decl., ¶7.

[25] As noted elsewhere herein, Plaintiff has no U.S. patent rights covering the Opulen Reader, by assignment or otherwise. Plaintiff is just a customer of Opulen and has no agreements with them concerning the reader; Hoffman Dep., V. I, p. 64, ll.

clearance[26] from Food and Drug Administration to sell the Opulen Reader in the United States, it reported to TECO that it was able to sell the reader internationally.[27]

In furtherance of the international market evaluation of Plaintiff's Kits (as applied to the Opulen Reader), KC Chen and Tong Chiah of TECO met with Dr. Robert Hoffman of Plaintiff AntiCancer, Inc. in or about August of 2006. During that meeting, Dr. Chen explained to Dr. Hoffman that he wanted to evaluate the market potential of Plaintiff's Kits at an upcoming trade show in Germany, called MEDICA.[28] Dr. Hoffman told Dr. Chen that would be "okay."[29]

In August of 2006, the parties also began exchanging drafts of various agreements. Among these was a Product Exclusive Agreement ("PEA").[30] The PEA was intended to define the basic terms relating to TECO's purchase of product from Plaintiff for distribution in the United States. Under Paragraph 1 of the PEA, for example, TECO was to be granted the exclusive right promote and sell Plaintiff's Kit *under the brand "TECO DIAGNOSTICS."*[31]

---

[26] Section 510(k) of the Food, Drug and Cosmetic Act requires device manufacturers to notify the FDA, at least 90 days in advance, of their intent to market a medical device. This is known as Premarket Notification - also called PMN or 510(k). It allows the FDA to determine whether the device is equivalent to a device already placed into one of the three classification categories. Thus, "new" devices (not in commercial distribution prior to May 28, 1976) that have not been classified can be properly identified. Specifically, medical device manufacturers are required to submit a premarket notification if they intend to introduce a device into commercial distribution for the first time or reintroduce a device that will be significantly changed or modified to the extent that its safety or effectiveness could be affected. Such change or modification could relate to the design, material, chemical composition, energy source, manufacturing process, or intended use.

[27] Chen Decl., ¶9.

[28] Chen Decl., ¶10.

[29] Chen Decl., ¶10.

[30] Chiah Decl., ¶8, Ex. A.

[31] Chiah Decl., ¶7.

Case No. 07 CV2294-L (BLM)
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

The initial draft of the PEA was prepared by TECO.[32]  Plaintiff later provided TECO with its proposed revisions to the PEA. Notably, Plaintiff *did not* remove or revise the branding provision. According to Li Tang of AntiCancer, Inc., Plaintiff was prepared to sign the revised draft of the PEA and was merely waiting for TECO to do so.[33] However, because the parties were continuing to assess the application of Plaintiff's Kit to the CX Reader while these drafts were exchanged, the PEA was not executed.[34]

During August and September of 2006, the parties also exchanged drafts of a Confidential Disclosure Agreement ("CDA").[35] The CDA was intended to provide a framework for the treatment of confidential information exchanged between the parties.[36] The CDA was ultimately executed effective September 18, 2006.[37] The purpose of the CDA was to allow the parties to evaluate "the suitability of entering into a business relationship."[38]

In furtherance of the parties' prospective business relationship, TECO purchased one Opulen Reader and one Kit from Plaintiff on October 16, 2006, for the sum of $1,600.00.[39] To evaluate the international market for these products, TECO prepared a one-page informational flyer (the "Flyer"), which it brought to the MEDICA show in Germany.[40] The Flyer depicted "mock-ups" of both the Kit and the Opulen Reader.[41] However, no *pricing* or *sales information*

---

[32] Chiah Decl., ¶8.

[33] Chiah Decl., ¶8; Deposition of Li Tang ("Tang Depo."), p.59, ll. 19-24.

[34] Chiah Decl., ¶8.

[35] Chiah Decl., ¶9, Ex. B.

[36] Chiah Decl., ¶9.

[37] Chiah Decl., ¶9.

[38] Chiah Decl., ¶9, Ex. B.

[39] Chen Decl., ¶11, Ex. A.

[40] Chen Decl., ¶12, Ex. B.

[41] Chen Decl., ¶12, Ex. B.

was included on the Flyer.[42]  The Flyer was merely informational.  Also, consistent with paragraph 1 of the PEA, the product mock-ups were branded under the TECO DIAGNOSTICS brand.[43]  The reverse side of the Flyer contained basic information, relating to procedures and specifications for the Kit. This information was provided to TECO by Plaintiff and was part of the publicly-distributed package insert provided by Plaintiff to purchasers of the Kit.[44]

To further evaluate the potential market for Plaintiff's Kit, TECO prepared a short informational statement for inclusion on its website. Like the Flyer, the website statement *did not contain pricing or sales information*.[45]  Rather, the website only provided general information about the Kit, including the fact that it was covered by several U.S. patents and had received 510(k) clearance, which had been obtained by TECO's joint venture partner Plaintiff.[46]  As with the Flyer, and consistent with the preliminary drafts of the PEA, the website referenced the products under the TECO DIAGNOSTICS brand.

There was very limited response to the Flyer at the MEDICA show and very view Flyers were handed out.[47]  No one ordered or attempted to order the Kit from TECO at the show.[48]  No sales were made or even discussed.[49]  TECO brought the extra Flyers back to the United States after the show was over.[50]  There was absolutely no response to the website posting.[51]

---

[42] Chiah Decl., ¶10, Ex. C.

[43] Chiah Decl., ¶10.

[44] Chen Decl., ¶12.

[45] Chiah Decl., ¶12, Ex. D.

[46] Chiah Decl., ¶12.

[47] Chen Decl., ¶13.

[48] Chen Decl., ¶13.

[49] Chen Decl., ¶13.

[50] Chen Decl., ¶13.

[51] Chiah Decl., ¶12.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Approximately two weeks after the MEDICA trade show in Germany, TECO received a telephone call from Ms. Tang, inquiring about the status of the parties' joint venture. During this call, there was no mention that Plaintiff was not interested in pursuing the joint venture with TECO or that the deal was "dead." In fact, well into the year 2007, TECO continued to conduct testing relative to the application of Plaintiff's Kit to the CX Reader. Based on the discussions between the parties, including the length of time proper testing would take to complete (i.e., one (1) year), TECO also understood that Plaintiff was doing the same.

Plaintiff alleges in its Second Amended Complaint ("SAC"), however, that negotiations between the parties regarding the marketing agreement broke down. Conspicuously, Plaintiff fails to allege *when* the negotiations broke down. This is telling. Ultimately, Plaintiff sued TECO (and the other individual defendants); however, this was not until long after the trade show in Germany and indeed well into 2007. Based on Plaintiff's words and conduct, TECO was clearly justified in its belief that the parties were still pursuing the joint venture at the time it attended the trade show in Germany and well into 2007.

TECO never made any Kits itself, never used any Kits, never sold any Kits, never offered to sell any Kits, and never received any orders for Kits. In short, TECO has received no money or business relating to the Kits.[52]

## II.    APPLICABLE LAW

### A.    Plaintiff has failed to Meet its Burden for Partial Summary Judgment

Summary judgment is proper only where there is no genuine issue of "material fact." In the present case, Plaintiff has moved for "partial summary judgment." Unlike summary judgment, a "partial summary judgment" does not terminate the action. It is merely an interlocutory order and is subject to revision. Fed. R. Civ. P. 54(b). To that end, a partial summary judgment is simply a pretrial order that the judge can change.

---

[52] Chen Decl., ¶14.

As the moving party, Plaintiff bears the initial burden to inform the district court of the basis for its motion, and to identify the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Here, Plaintiff has failed to demonstrate the absence of a genuine issue of material fact.

In considering a motion for partial summary judgment, the court may grant the motion *only if* there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Trial courts are urged to act with caution in granting summary judgment, and may deny summary judgment where there is reason to believe that the better course would be to proceed to trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The moving party's papers are construed narrowly, such that no case with a possible triable issue of fact will be disposed of summarily. Id. at 250. Furthermore, the Court must view the evidence presented in the motion in the light most favorable to the nonmoving party. T.W. Elec.Serv. v. Pacific Electric Contractors Assoc., 809 F.2d 626, 630_631 (9th Cir. 1987). If the moving party fails to establish the nonexistence of a genuine issue of material fact, the motion must be denied. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

**B.     Plaintiff has failed to Prove that Teco has Infringed Any of the Claims of the Patents-in-Suit**

Plaintiff has failed to prove that TECO infringed any of the claims of the Patents-in-Suit. Any analysis of patent infringement necessarily begins with the statute, 35 U.S.C. §271, which provides in pertinent part:

> (a) Except as otherwise provided in this title, whoever *without authority makes, uses, offers to sell, or sells* any patented invention, *within the United States,* or imports into the United States any patented invention during the term of the patent therefor, infringes the patent. 35 U.S.C. §271(a).

Thus, to prevail on the present Motion, Plaintiff must prove that TECO *made, used, offered to sell, or sold* Plaintiff's patented invention in the United States *without authority.*

Plaintiff has not only failed to present any competent or admissible evidence proving that TECO made, used, offered to sell, or sold any patented invention, in the United States or elsewhere, it has failed to demonstrate the absence of any genuine issue on these facts. Rather, the only "evidence" offered by Plaintiff consists of a purported admission of infringement by TECO in its Answer to the Second Amended Complaint and TECO's Flyer. For the reasons set forth below, neither warrants the granting the present Motion.

### C.    Teco has Not Admitted Patent Infringement

Much of Plaintiff's Motion is directed to a single sentence from the Second Amended Complaint. Plaintiff attempts to have the Court consider this sentence out of context - without any reference to the lengthy course of dealings between the parties and without reference to TECO's unequivocal denial of *all* of the patent infringement allegations in the Second Amended Complaint - and on that basis rule that it is tantamount to an admission of patent infringement. This is absurd.

The relevant sentence reads: "Nevertheless, on November 9, 2006, Teco publicly *announced* that it had developed a Homocysteine Assay kit which utilizes a genetically-engineered enzyme, the same process patented by AntiCancer."[53] Notably, "announcing" is not one of the verbs listed in Section 271 constituting patent infringement. Plaintiff must demonstrate that TECO "made, used, offered to sell, or sold" Plaintiff's patented invention. Plaintiff has not and cannot.

In the course of the parties' ongoing discussions, meetings and testing, TECO made clear to Plaintiff its intention to evaluate, market and promote *Plaintiff's* Kit. Indeed, Plaintiff admits this.[54] Moreover, Dr. Chen of TECO told Plaintiff that he wanted to evaluate the market

---

[53] Second Amended Complaint, ¶16 (emphasis added).

[54] Hoffman Depo., V.I., p. 67, l. 25-p. 69, l. 8 – Referring to the subject matter discussed during one of the parties' many meetings, Dr. Hoffman admits "[w]e talked about how they wanted sell this assay, *our assay* in different territories" (emphasis added).

potential of *Plaintiff's* Kit[55] and, in response, Plaintiff told him that would be "okay."[56] Plaintiff even *sold* TECO the very kit at issue. Clearly, against this backdrop, the homocysteine assay kit referred to in TECO's "public announcement" was *Plaintiff's Kit* – the kit Plaintiff had authorized TECO to evaluate, the kit Plaintiff had sold TECO, the kit that Plaintiff and TECO were *jointly* testing to determine whether it could be applied to other readers. There is no evidence – and indeed Plaintiff has proffered none – that TECO "made, used, offered to sell, or sold" *another* homocysteine assay test that utilizes the same process patented by Plaintiff. The absence of such proof is fatal to Plaintiff's Motion.

Conveniently, Plaintiff also fails to point out that TECO *denied all* of the patent infringement allegations in the Second Amended Complaint. Throughout the Second Amended Complaint, Plaintiff alleges that "defendants have infringed, and still are infringing [Plaintiff's patents] by *making, using, selling, offering for sale and/or licensing* products and services. . .without plaintiff's authorization or consent."[57] Significantly, TECO *denied* each and every one of these allegations in its Amended Answer to the Second Amended Complaint.[58] Thus, TECO has unequivocally denied engaging in the only conduct proscribed by 25 U.S.C. §271, namely making, using, offering to sell, and selling a patented invention. Taken in its entirety, TECO's Amended Answer to the Second Amended Complaint cannot be said to contain an admission of patent infringement.

In addition, TECO has proof of the contrary. As noted above, TECO has never developed or manufactured its own homocysteine assay test that uses any of the processes or methods that are used in the homocysteine assay test sold by AntiCancer, Inc., nor has it

---

[55] Chen Decl., ¶10. Moreover, another fatal defect in Plaintiff's "public announcement" theory is that the MEDICA trade show was in Germany. As noted, 35 U.S.C. §271 requires that the infringing conduct occur within the United States.

[56] Chen Decl., ¶10.

[57] Second Amended Complaint, ¶¶20, 28, 36, 44, and 52 (emphasis added).

[58] Declaration of Roger N. Behle, Jr., Ex. C – Amended Answer to Second Amended Complaint, ¶1.

developed or manufactured any homocysteine assay test that utilizes a genetically-engineered enzyme.[59] Moreover, TECO has never made, used, sold, offered to sell, imported/exported, or licensed any homocysteine assay test (other than the homocysteine assay test manufactured by Catch, Inc., referenced above) anywhere in the United States or abroad.[60] The Motion should be denied.

### D.    As a Matter of Law, TECO is Not Liable for Patent Infringement under the "First Sale Doctrine"

The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent. See Bloomer v. Millinger, 68 U.S. (1 Wall.) 340, 350-51, 17 L. Ed. 581 (1864). The patent owner's rights with respect to the product end with its sale, United States v. Univis Lens Co., 316 U.S. 241, 252, 53 USPQ 404, 408, 86 L. Ed. 1408, 62 S. Ct. 1088 (1942), and a purchaser of such a product may use or resell the product free of the patent. Id. at 250, 53 USPQ at 408.[61] This longstanding principle applies similarly to a sale of a patented product manufactured by a licensee acting within the scope of its license. See Unidisco, Inc. v. Schattner, 824 F.2d 965, 968, 3 USPQ2d 1439, 1441 (Fed. Cir. 1987), cert. denied, 484 U.S. 1042, 98 L. Ed. 2d 860, 108 S. Ct. 774 (1988). Intel Corp. v. ULSI Sys. Technology, 995 F.2d 1566, 1568 (Fed. Cir. 1993).

In the instant case, it is undisputed that Plaintiff *sold* TECO "one Homocysteine Assay kit" and "one AntiCancer portable reader."[62]  This was an authorized sale and TECO paid

---

[59] Vaeches Decl., ¶5.

[60] Vaeches Decl., ¶6.

[61] The patentee surrenders his monopoly "by the sale of his patent or in part by the sale of an article embodying the invention. His monopoly remains so long as he retains the ownership of the patented article. But sale of it exhausts the monopoly in that article and the *patentee may not thereafter, by virtue of his patent, control the use or disposition of the article.*" Bloomer v. McQuewan, 14 How. 539, 549-50; Adams v. Burke, 17 Wall. 453 (1873); Hobbie v. Jennison, 149 U.S. 355; United States v. Univis Lens Co., 316 U.S. 241, 250 (U.S. 1942).

[62] Motion, p. 3, ll. 10-11; Hoffman Decl., ¶7.

$1,600.00 to Plaintiff for the Kit and reader.[63] In accordance with the parties' earlier discussions and agreement, TECO prepared the subject Flyer to test the potential market for Plaintiff's Kit. To this end, the Opulen Reader and Kit were those Teco *purchased* from Plaintiff – not anything Teco independently manufactured. Having sold the Kit and Opulen Reader to Teco, Plaintiff surrendered its patent monopoly and thereby the right to control the use or disposition of the reader and Kit.

**E.    As a Matter of Law, TECO is Not Liable for Patent Infringement under the Doctrine of Implied License**

Plaintiff alleges that TECO infringed its patents without *"authorization or consent."*[64] This is unfounded. Moreover, for purposes of the present Motion, Plaintiff has failed to demonstrate the absence of a genuine issue of material fact as to authorization and consent. Based on Plaintiff's conduct, including the negotiations, the executed CDA, and ongoing dialogue relating to the joint venture, TECO reasonably believed that it had an implied license to test market the Kit and make reference to it in the Flyer.

An "implied license" is an affirmative defense to a patent infringement claim. Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1350 (Fed. Cir. 2003). An "implied license" can be created by words or conduct on the part of the patent holder which would give rise to the impression that the patent holder consents to the use of their product. De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (U.S. 1927). The elements of an implied license are: (1) whether a relationship existed between the two parties; (2) within that relationship, did the patent holder grant to the alleged infringer a right to use the patented invention; (3) did the patent holder received valuable consideration for that grant of right; (4) did the patent holder deny that the alleged infringer had an implied license; and (5) did the patent holder's statements and comments create the impression that it had consented to the alleged infringer making,

---

[63] Chen Decl., ¶11, Ex. A.

[64] Second Amended Complaint, ¶¶20, 28, 36, 44, and 52 (emphasis added).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

using, or selling the patented inventions.  See  Wang Lab. v. Mitsubishi Elecs. Am., 103 F.3d 1571, 1579 (Fed Cir. 1997).

In this case, the facts clearly support finding that TECO enjoyed an implied license relative to the Kit.  For nearly a year, between August of 2006 and July of 2007, Plaintiff and TECO were actively pursuing a joint venture, pursuant to which they intended to evaluate, market and sell the Kit to TECO's customers. In furtherance of the joint venture, the parties exchanged information, testing data, and products. Clearly, the parties *intended* that these materials be used for their mutual benefit *without limitation.* Indeed, there is nothing in the record to suggest that Plaintiff ever restricted TECO's use of the Kit, or that it terminated the parties' joint venture discussions before the subject lawsuit was filed.

At the time of the alleged infringement, the parties were still actively pursuing the terms of this joint venture.  In good faith and in an effort to promote the venture, TECO developed the Flyer and referenced *Plaintiff's* Kit. No one ordered or attempted to order the Kit from TECO.[65] No sales were made or even discussed.[66] There was absolutely no response to the website posting.[67]

Plaintiff sold TECO this Kit for the very purpose for which it was used, namely, to evaluate the Kit and the market potential for the Kit. It was clear from the parties' discussions and actions that their respective contributions to the venture would be mutually beneficial. The clear weight of the evidence shows that the parties were, indeed, in a business relationship. Within that relationship, Plaintiff's statements and comments created the impression that it had consented to TECO's use of the Kit in the manner and fashion presented here. Plaintiff's actions and conduct created the impression that a license was created. As such, Plaintiff is estopped, a year after the alleged infringement, to claim that the reference to the Kit in TECO's Flyer constitutes patent infringement.

---

[65] Chen Decl., ¶13.

[66] Chen Decl., ¶13.

[67] Chiah Decl., ¶12.

**F.    As a Matter of Law, TECO's Flyer and Website Do Not Constitute Offers to Sell under 35 U.S.C. §271**

Plaintiff also alleges that the Flyer and website constitute "offers to sell" – forming an independent basis of liability – under 35 U.S.C. §271.[68] Plaintiff is wrong on the law. As noted above, no *pricing* or *sales information* was included on the Flyer.[69] The Flyer was merely informational. Like the Flyer, the website statement also *did not contain pricing or sales information*.[70] Rather, the website only provided general information about the Kit.

TECO has not made an "offer to sell" within the meaning of 35 U.S.C. §271.  As held by the Court of Appeals for the Federal Circuit, the meaning of "offer to sell" is to be interpreted according to its ordinary meaning in contract-law." Rotec Industries, Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1255 (Fed. Cir. 2000).

Courts have long considered websites and brochures without pricing information insufficient to constitute offers to sell. See VP Intellectual Properties, LLC v. IMTEC Corporation, 1999 U.S. Dist. LEXIS 19700, 1999 WL 1125204, 5-6 (D.N.J. Dec. 9, 1999) (holding that an Internet site containing product descriptions but no pricing information is not an "offer to sell"); Intel Corporation v. Silicon Storage Tech. Inc., 20 F. Supp.2d 690, 696 (D.Del.1998) (holding that mere advertisements which are directed at a national audience and contain no pricing information are insufficient in and of themselves to constitute an "offer to sell"), and Lucent Technologies, Inc. v. Newbridge Networks Corp., 168 F. Supp.2d 181, 229 (D. Del 2001). A more recent district court decision, specifically evaluating websites and brochures, held "that a catalog or website that does not contain pricing information does not constitute an offer to sell." Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1334, 1342 (S.D. Fla. 2003).

---

[68] Motion, p. 1, ll. 11-14.

[69] Chiah Decl., ¶10, Ex. C.

[70] Chiah Decl., ¶12, Ex. D.

1    In the instant case, Plaintiff has failed to prove that TECO has offered to sell an

2  infringing device or product, through the Flyer, website or otherwise. As such, Plaintiff has

3  failed to carry its burden on the present Motion.

4  **III.    CONCLUSION**

5    For all of the reasons set forth above, TECO respectfully request that the Court DENY

6  Plaintiff Motion for Partial Summary Judgment in its entirety.

7

8  Dated: July 3, 2008                    FOLEY BEZEK BEHLE & CURTIS, LLP

9

10                                        s/Roger N. Behle, Jr._____

11                                        Roger N. Behle, Jr.
                                          Attorneys for Defendants.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF ORANGE:**

    The undersigned hereby certifies that all counsel of record in the Anticancer, Inc. v. Teco Diagnostics, Case No. 07CV2294L (BLM), who are deemed to have consented to electronic service, are being served this 11th of July 2008, with a copy of this document: **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF ANTICANCER, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** via the Court's CM/ECF as follows:

Dan Lawton, Esq.

LAWTON LAW FIRM

402 West Broadway, Suite 1860

San Diego, CA 92101

619-595-1520 Facsimile


    □    BY HAND DELIVERY: I personally delivered a true copy of the above-referenced document(s) to the person(s) listed above.

    □    BY OVERNIGHT DELIVERY: I am familiar with the practice at my place of business for collection and processing of documents for overnight delivery with an overnight courier service. The above-referenced document(s) will be placed in an envelope, addressed to the person(s) listed above, sealed, and placed for collection and delivery the next business day with fees fully prepaid in accordance with ordinary business practices.

    □    BY FACSIMILE: I caused the above-referenced document(s) to be served on the person(s) listed above by facsimile and from Foley Bezek Behle & Curtis, LLP's facsimile machine no. (714) 546-5005.

    □    BY E-MAIL: I submitted an electronic version of the above-referenced document(s) to the person(s) whose e-mail address(es) is/are known to me as listed above.

    ■    BY MAIL: I am familiar with the practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. The

above-referenced document(s) will placed in an envelope, addressed to the person(s) listed above, sealed, and deposited with the United States Postal Service with postage fully prepaid in accordance with the ordinary course of business.

■ (FEDERAL) I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

☐ (STATE) I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

I certify that all parties in this case that have made an appearance are represented by counsel who are CM/ECF participants who have consented to electronic service.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

Dated: July 11, 2008

s/Roger N. Behle, Jr.
Roger N. Behle, Jr.
Attorneys for Defendants.