1  Dan Lawton (State Bar No. 127342)
   Joseph C. Kracht (State Bar No. 228507)
2  Matt Valenti (State Bar No. 253978)
   Lisa M. Pisano (State Bar No. 256882)
3  LAWTON LAW FIRM
   Emerald Plaza
4  402 West Broadway, Suite 1860
   San Diego, CA 92101
5  (619) 595-1370
   (619) 595-1520 (Telefacsimile Number)
6  dlawton@lawtonlaw.com (electronic mail)

7  Attorneys for Plaintiff AntiCancer, Inc.

8

9

10                 IN THE UNITED STATES DISTRICT COURT

11                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13 ANTICANCER, INC., a California          )  Case No. 07-CV-2294-L (BLM)
   corporation,                            )
14                                         )
         Plaintiff,                        )  REPLY MEMORANDUM OF POINTS
15                                         )  AND AUTHORITIES IN SUPPORT OF
   v.                                      )  PLAINTIFF ANTICANCER, INC.'S
16                                         )  MOTION FOR PARTIAL SUMMARY
   TECO DIAGNOSTICS, a California          )  JUDGMENT OF PATENT
17 corporation; KC CHEN, a natural person; )  INFRINGEMENT BY DEFENDANT
   TONG CHIAH, a natural person; JIAN      )  TECO DIAGNOSTICS
18 YANG VAECHES, a natural person; and     )
   DOES 1-30,                              )
19                                         )  Date:   July 21, 2008
                                           )  Time:   10:30 a.m.
20       Defendants.                       )  Place:  Courtroom 14
                                           )  Judge:  Hon. M. James Lorenz
21 _____ )

22

23

24

25

26

27

28

Case No. 07CV2294L(BLM)

# TABLE OF CONTENTS

PAGE

I. DESPITE ITS DENIALS OF INFRINGEMENT, TECO IN FACT ADMITTED PATENT INFRINGEMENT BY ADMITTING THE ALLEGATIONS OF PARAGRAPH 16 OF ANTICANCER'S SECOND AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. TECO'S REFERENCES TO THE "PEA" ARE IMPROPER BECAUSE THE PARTIES NEVER SIGNED THE PEA AND THEREFORE IT DOES NOT GOVERN THE RELATIONSHIP BETWEEN THE PARTIES. FURTHERMORE, AS A MATTER OF LAW, THERE WAS NO CLEARLY ASCERTAINABLE AGREEMENT TO "PRE-MARKET" THE ASSAY KIT VIA THE FLYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Unsigned "PEA" Gave Teco No Authority to Market or Test-Market AntiCancer's Patented HA Kit Under the Teco Brand Name . . . . . . . . . . . . . . 2

    B. AntiCancer Never Assented to Any Agreement Allowing Teco to Create a Flyer Showing the HA Kit Under the Teco Brand Name . . . . . . . . . . . . . . . . . 3

III. THE FIRST SALE DOCTRINE DOES NOT APPLY BECAUSE ANTICANCER AND TECO ENTERED A VALID AND BINDING CONFIDENTIALITY AGREEMENT WHICH PROTECTED ANTICANCER'S PATENT RIGHTS THROUGH THE AUTHORIZED SALE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. Unlike in Teco's Cited Cases, Here the Parties Were Bound By The Confidential Disclosure Agreement of September 18, 2006 Which Was a Condition on the Sale of the Kit and the Reader . . . . . . . . . . . . . . . . . . . . . . . . 5

    B. Teco Misunderstands the First Sale Doctrine, and the Application Teco Urges This Court to Adopt Would Lead to an Absurd Result . . . . . . . . . . . . . . . . . . . 6

        1. Teco's cases are distinguishable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2. Teco construes the loss of patent rights too broadly . . . . . . . . . . . . . . 7

IV. TECO HAD NO IMPLIED LICENSE TO MARKET THE ASSAY KIT AND EVEN IF IT DID, THAT LICENSE EXPIRED IN DECEMBER 2006 WHEN TECO WITHDREW ITS PARTICIPATION FROM THE SO-CALLED JOINT VENTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.   BECAUSE NONE OF TECO'S INVENTORY OR PRODUCTS ON ITS WEBSITE LIST A PRICE, YET ARE OFFERED FOR SALE BY TECO, TECO'S FLYER AND WEBSITE CONSTITUTED OFFERS TO SELL UNDER 35 U.S.C. § 271. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TABLE OF AUTHORITIES

PAGE

CASES

*Bloomer v. Millinger*
68 U.S. (1 Wall.) 340 (1864) ................................................... 6

*Intel Corporation v. ULSI Technology*
995 F.2d 1566, 1567 (Fed. Cir. 1993) ..................................... 6, 7

*Jakobson Shipyard, Inc. v. Aetna Casualty and Surety Co.*
775 F.Supp. 606, 613 (S.D.N.Y. 1991) ................................... 8

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*
243 U.S. 502, 516, 61 L.Ed. 871, 37 S. Ct. 416, 420 (1917) ............ 5

*Murrey v. United States*
73 F.3d 1448, 1455 (7th Cir. 1996) ........................................ 1

*PPX Enterprises, Inc. v. The Audiofidelity, Inc.*
746 F.2d 120, 123 (2d Cir. 1984) .......................................... 1

*Quanta Computer, Inc. v. LG Electronics, Inc.*
__ U.S. __, __ L.Ed.2d __,128 S. Ct. 2109, 2116 (2008) ............ 5

*Rennick v. O.P.T.I.O.N. Care, Inc.*
77 F.3d 309, 315 (9th Cir. 2004) .......................................... 4

*Unidisco, Inc. v. Schattner*
824 F.2d 965, 968 (Fed. Cir. 1987) ....................................... 6

*United States v. Univis Lens Co.*
316 U.S. 241, 86 L.Ed. 1408, 62 S. Ct. 1088 (1942) .................. 6, 7

*Wesley Jessen Corp. v. Bausch & Lomb, Inc.*
256 F. Supp. 2d. 228, 233 (D. Del. 2003) ............................... 1

STATUTES

35 U.S.C. § 271 ................................................................ 1, 2

OTHER AUTHORITIES

Williston on Contracts, §4.1 (Thomson Reuters/West, 2007) ............ 4

I.   DESPITE ITS DENIALS OF INFRINGEMENT, TECO IN FACT ADMITTED PATENT INFRINGEMENT BY ADMITTING THE ALLEGATIONS OF PARAGRAPH 16 OF ANTICANCER'S SECOND AMENDED COMPLAINT.

Teco argues because it denied all patent infringement allegations, because "announcing" is not a verb appearing in Section 271, and because Teco did not develop a kit of its own, Teco has not admitted infringement by admitting the allegations of paragraph 16. Teco is wrong (and in ignoring all of AntiCancer's cases regarding judicial admissions, fails to appreciate the weight accorded judicial admissions).

Judicial admissions trump evidence and are binding on the parties. *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996); *PPX Enterprises*, *Inc. v. The Audiofidelity*, *Inc.*, 746 F.2d 120, 123 (2d Cir. 1984). Yet, Teco attempts to deflect the Court's attention from its admission of infringement to its denials contained within its Amended Answer. Teco argues that the Court should consider Teco's Amended Answer in its entirety (and in doing so, blind itself to the admission in paragraph 16). However, whatever denials Teco may have made are meaningless if it admits conduct amounting to infringement. Here, Teco did just that. By admitting the allegations in paragraph 16 (excepting a portion of paragraph 16 regarding the breakdown of communications between the parties), Teco admitted the following:

> [O]n November 9, 2006, Teco publicly announced that it had developed a homocysteine assay kit which utilizes a genetically-engineered enzyme, the same process patented by AntiCancer. Teco marketing materials for this product include a picture showing 11 bottles labeled "A/C Enzymatic Assay" – the very same A/C Diagnostics bottles which were provided by AntiCancer to Teco in the Homocysteine Assay kit."

*See* Plaintiff AntiCancer's Second Amended Complaint, ¶ 16.

What Teco has done is admit that it offered to sell AntiCancer's patented HA Kit in the United States. Without permission from AntiCancer, Teco reached out to American consumers from its website. Teco also displayed a flyer with a picture of AntiCancer's kit on it, with Teco branding, at a conference in San Diego. *See* Hoffman Reply dec., ¶ 3-4. Under Section 271, this is patent infringement. 35 U.S.C. § 271, subdivision (a); *see also Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 256 F. Supp. 2d. 228, 233 (D. Del. 2003) ["[A]n unauthorized offer to sell a patented invention within the United States creates a separate

1 cause of action for patent infringement."]. And while Teco's obvious observation that
2 "announcing" is not a verb listed under Section 271 is true, Teco placed the announcement
3 on its website, where Teco lists products available for sale. By admitting to the above
4 allegations in paragraph 16, Teco has admitted that the materials were "marketing materials"
5 and as discussed below, Teco's infringing materials were offers for sale, which is one of the
6 infringing actions listed in Section 271.

7     Teco argues that "there is no evidence . . . that TECO 'made, used, offered to sell, or
8 sold' *another* homocysteine assay kit that utilizes the same process patented by plaintiff."
9 Teco Oppo. at 15. This argument lacks merit. Section 271 does not require that the infringer
10 come up with an independent product in order for the patent holder to prevail. Section 271
11 says only that "whoever without authority . . . offers to sell . . . any patented invention . . .
12 infringes the patent." Here, Teco offered for sale AntiCancer's kit, which is protected by
13 various process patents. Teco offered the kit for sale in the United States by advertising on
14 its website, and also by showing the Flyer at the AACC conference in San Diego in July of
15 2007. *See* Hoffman Reply dec., ¶ 4. Teco represented that it held FDA approval and the
16 patents related to the HA Kit. This was and is infringement under Section 271.

17 II.    TECO'S REFERENCES TO THE "PEA" ARE IMPROPER BECAUSE THE
        PARTIES NEVER SIGNED THE PEA AND THEREFORE IT DOES NOT
18         GOVERN THE RELATIONSHIP BETWEEN THE PARTIES. FURTHERMORE,
        AS A MATTER OF LAW, THERE WAS NO CLEARLY ASCERTAINABLE
19         AGREEMENT TO "PRE-MARKET" THE ASSAY KIT VIA THE FLYER.

20     At several times throughout its opposition brief, Teco references the Product
21 Exclusive Agreement ("PEA") drafted by Teco and contemplated by the parties in their early
22 negotiations. Teco Oppo. at 9-11. The parties never signed the PEA. Hoffman Reply dec., ¶
23 2. Thus, the PEA is irrelevant.

24     A.    <u>The Unsigned "PEA" Gave Teco No Authority to Market or Test-Market
        AntiCancer's Patented HA Kit Under the Teco Brand Name.</u>
25

26     For example, Teco states that the PEA would have "granted [Teco] the
27 exclusive right [to][sic] promote and sell Plaintiff's Kit *under the brand 'TECO*
28 *DIAGNOSTICS'*," and that "Plaintiff *did not* remove or revise the branding provision." Teco

Oppo. at 9-10, emphasis in original. Teco further states that the MEDICA flyer was created "consistent with paragraph 1 of the PEA" and therefore "branded under the TECO DIAGNOSTICS brand." Teco Oppo. at 10. These references are improper. Because the parties never signed the PEA, its terms did not and do not govern the parties and did not memorialize anything. The simple reality is that Teco and AntiCancer never reached a deal, and AntiCancer did not agree for Teco to "test market" its HA Kit using Teco branding or a photograph of AntiCancer's kit in a Teco flyer. Hoffman Reply dec., ¶ 3. Thus it is improper for Teco to insinuate that there was a some sort of deal in place by stating that it abided by an agreement (the PEA) which was never signed.

     B.    <u>AntiCancer Never Assented to Any Agreement Allowing Teco to Create a Flyer Showing the HA Kit Under the Teco Brand Name.</u>

Teco also argues that Dr. Hoffman entered into an agreement with Teco to market AntiCancer's kit with a flyer. As explained below, Dr. Hoffman never agreed to the use of the flyer.

Dr. KC Chen told Dr. Hoffman "that he wanted to evaluate the market potential of Plaintiff's kits at an upcoming trade show in Germany," and that "Dr. Hoffman told Dr. Chen that would be 'okay.'" Teco Oppo. at 9. However, at Dr. Chen's deposition, Dr. Chen gave conflicting testimony, saying that he "thought" Dr. Hoffman said "okay," or that he "thought" Dr. Hoffman nodded his head. *See* Deposition of Dr. Chen, 43: 8-24 (attached to Reply Lawton dec. as Exhibit L). When asked by AntiCancer's counsel whether Dr. Hoffman's nodding gave Dr. Chen permission to create the flyer, Dr. Chen initially responded, "No," because according to Dr. Chen, they had no contract yet, but that Dr. Hoffman "seemed" okay with it. *See* Exhibit L, 43: 25; 44: 2-4. However, when asked again, he changed his answer, this time saying that he thought Dr. Hoffman's head nod gave him permission to use AntiCancer's products in a flyer at the MEDICA meeting. *See* Exhibit L, 45: 4-9. Later on in the deposition, Dr. Chen admitted that he couldn't remember exactly what Dr. Hoffman said or did to indicate any sort of agreement. *See* Exhibit L, 151: 3-6.

1  Conflicting testimony about a supposed head nod does not a contract make. No case says
2  that it does.
3       Notably, Dr. Chen did not specifically mention the use of a flier. *See* Exhibit L, 45:
4  18-19. Dr. Chen did, however, testify that one nod of the head or a simple "okay" (which he
5  had difficulty remembering) gave Teco virtually limitless power to test-market AntiCancer's
6  products in any way it desired. *See* Exhibit L, 240: 11-23. This is impossible as a matter of
7  law. "Mutual assent is essential to the formation of informal contracts," and that "the mutual
8  assent must be manifested by one party to the other." Williston on Contracts, §4.1 (Thomson
9  Reuters/West, 2007). Secret or subjective intent is immaterial, and only the parties' overt
10 words or acts will be weighed in determining mutual assent. *Ibid*. "The parties must
11 communicate their mutual consent to enter into a contract." *Rennick v. O.P.T.I.O.N. Care*,
12 *Inc.*, 77 F.3d 309, 315 (9th Cir. 2004).
13      Here, Dr. Chen admitted that he didn't remember whether Dr. Hoffman nodded or
14 said, "okay," and in fact *assumed* that Dr. Hoffman would be "okay" with whatever Teco
15 decided to do to test-market AntiCancer's kit. *See* Exhibit L, 43: 25; 44: 2-4. Even viewing
16 the facts of the situation in the light most favorable to Teco, there can be no objective
17 agreement here. As a matter of law, whatever Dr. Chen assumed Dr. Hoffman's subjective
18 intent was cannot be the basis of an agreement which would have allowed Teco to do
19 anything it wanted to test market the HA Kit. *Id*. It follows Teco's argument about the PEA
20 fails.
21 III.   THE FIRST SALE DOCTRINE DOES NOT APPLY BECAUSE ANTICANCER
        AND TECO ENTERED A VALID AND BINDING CONFIDENTIALITY
22      AGREEMENT WHICH PROTECTED ANTICANCER'S PATENT RIGHTS
        THROUGH THE AUTHORIZED SALE.
23
24      Citing the "first sale" doctrine, Teco argues that because AntiCancer sold Teco a
25 portable reader and HA kit, AntiCancer lost all rights to protect its patent. This is not correct.
26 The cases cited by Teco do not apply because none of the parties in those cases were bound
27 by a similar confidentiality agreement. Teco also misunderstands the law and urges this
28 Court to adopt a nonsensical and draconian view of the first sale doctrine.

     A.    <u>Unlike in Teco's Cited Cases, Here the Parties Were Bound By The Confidential Disclosure Agreement of September 18, 2006 Which Was a Condition on the Sale of the Kit and the Reader.</u>

As a preliminary matter, the right to vend is exhausted by a single, **unconditional** sale. *Quanta Computer*, *Inc. v. LG Electronics*, *Inc.*, __ U.S. __, __ L.Ed.2d __,128 S. Ct. 2109, 2116 (2008), emphasis added; see also *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516, 61 L.Ed. 871, 37 S. Ct. 416, 420 (1917). Here, the parties' Confidential Disclosure Agreement ("CDA") was a condition on the sale of the reader and the kit. Thus, AntiCancer's patent rights remained intact in the wake of the execution of the CDA.

Teco and AntiCancer entered into the CDA on September 18, 2006. *See* Hoffman dec. (May 8, 2008), ¶ 6. This agreement protected, *inter alia*, "inventions" and "techniques" as confidential information. *See* Hoffman dec. (May 8, 2008), Exhibit A, ¶ 1. AntiCancer's patented HA Kit certainly qualifies as an invention and a technique. Further, Paragraphs 2 and 3 limited the parties' use of confidential information. Paragraph 2 limited use of confidential information for the purpose of "evaluation of the suitability of entering into a business relationship and for the additional purpose, if deemed appropriate by the parties, of negotiating the terms and condition of an agreement between them, **and for no other purpose** . . ." *See* Hoffman dec. (May 8, 2008), Exhibit A, ¶ 2, emphasis added. Paragraph 3 forbade the parties from disclosing confidential information for a period of 5 years. *See id.*, ¶ 3. Paragraph 6 provided that no license or patent rights were given with regard to the confidential information of the parties. *See id.*, ¶ 6. Therefore, the CDA was a condition on the sale. Only if Teco agreed to the CDA (which Teco itself drafted) would AntiCancer provide the materials for Teco to evaluate AntiCancer's kit. AntiCancer did not relinquish its patent rights and Teco had no right to advertise or market the HA Kit as its own.

None of the parties in Teco's cited cases had an agreement like the one between Teco and AntiCancer. In those cases, the parties were not bound in a preliminary stage of negotiations to hold certain information confidential. The cases Teco cites deal with parties who had a licensing agreement or other types of deals between them. AntiCancer and Teco

never arrived at a final deal and never signed any contract which would have given Teco a license or distributorship. The only information the Court has regarding license agreements is in the CDA which clearly states (in paragraph 6) that the CDA did not create any license or patent rights. *See* Hoffman dec. (May 8, 2008), Exhibit A, ¶ 6.

        B.    <u>Teco Misunderstands the First Sale Doctrine, and the Application Teco Urges This Court to Adopt Would Lead to an Absurd Result.</u>

Teco argues (and in doing so, construes its cited authority very broadly) because AntiCancer sold Teco one portable reader and one assay kit, AntiCancer lost all rights over its patented process, and gave Teco unbridled discretion to do whatever it wants with the kit. Teco is wrong. The cases do not support its conclusion.

        1.    <u>Teco's cases are distinguishable.</u>

The cases cited by Teco are distinguishable because the relationships between the parties in those cases materially differ from the relationship between Teco and AntiCancer. For example, *Bloomer v. Millinger* had to do with assignments of patent rights and the ability of the assignee to sell a planing machine during extensions of the patent. *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340 (1864). The *Univis Lens* case concerned the inability of the patentee to dictate the final price of a patented product the patentee has sold. *United States v. Univis Lens Co.*, 316 U.S. 241, 86 L.Ed. 1408, 62 S. Ct. 1088 (1942). The *Unidisco* case addressed the permissible sales of patented products by a licensee to a distributor authorized by the license agreement. *Unidisco, Inc. v. Schattner*, 824 F.2d 965, 968 (Fed. Cir. 1987). Lastly, the *Intel* case, from which Teco borrows its entire paragraph regarding the first sale doctrine, deals with the sale of computer coprocessors in the context of a broad licensing agreement granting the licensee an "irrevocable, retroactive, nonexclusive, world-wide, royalty free license." *Intel Corporation v. ULSI Technology*, 995 F.2d 1566, 1567 (Fed. Cir. 1993).

Essentially, in all of Teco's cited cases, the patent owners were in licensing or distribution agreements with the sellers (or had given assignments, as in *Bloomer*) which permitted the sellers to vend the product free of the patent monopoly. It was the sales of

patented products by those sellers to third parties that the courts held severed patent rights –
**not** the sale of the patented product by the patent owner to the licensee or distributor. As
discussed above, Teco and AntiCancer were in the preliminary stages of business
negotiations and lacked a licensing or distribution agreement. All of Teco's cases are
distinguishable on that basis (in addition to the fact that Teco and AntiCancer were each
bound by the CDA, as discussed above). The sale of the HA Kit and reader was a
conditional sale that did not implicate the first sale doctrine.

          2.      <u>Teco construes the loss of patent rights too broadly.</u>

        Even if the first sale doctrine did apply, Teco suggests an overly broad concept of what patent rights are lost in an unconditional sale. Teco essentially argues that by the sale of the reader and the HA Kit, AntiCancer lost all rights to its product, including the right to keep its name associated with the product (and to disallow someone else to offer the product for sale impermissibly under its own name). This is not the law.

Courts have been careful to frame the patent rights ending with an unconditional sale of a patented product narrowly. Upon sale, the patent owner loses the right to control the disposition of the patented product, such as setting the price of a product after it has been worked on by a licensee as in the *Univis Lens* case, or controlling the sale of patented products by a licensed seller, as in the *Intel* case. No court has ever held that an authorized sale allows a buyer to falsely market a purchased, patented invention as its own, absent a provision in a licensing agreement allowing the buyer to put its own branding on the product. Such a reading would directly contradict the established case law. Yet this is the interpretation of the law Teco urges the Court to adopt.

In short, none of Teco's cases support its argument, because the situations are so vastly different. AntiCancer did sell Teco a kit and a reader, but it was in the context of the confidentiality agreement, which prevented Teco from disclosing and using confidential information about AntiCancer's invention. And although Teco has indicated in the declarations of the individual defendants that Teco used the confidential information to promote the "joint venture" the two entities were contemplating (which would have been

allowed by the CDA as evaluating AntiCancer's product for a potential business relationship), one look at Teco's website posting and flyer show that there was nothing "joint" about the venture. AntiCancer is mentioned nowhere, and in the website posting Teco boldly asserts that it held the FDA approval and patents for AntiCancer's technology.

This was not a joint venture or a partnership, as Teco claims. Teco is an infringer as a matter of law.

### IV. TECO HAD NO IMPLIED LICENSE TO MARKET THE ASSAY KIT AND EVEN IF IT DID, THAT LICENSE EXPIRED IN DECEMBER 2006 WHEN TECO WITHDREW ITS PARTICIPATION FROM THE SO-CALLED JOINT VENTURE.

Teco argues that it believed it had an implied license to "test market the Kit and make reference to it in the Flyer." Teco oppo. at 17. Teco's reference to the executed CDA undermines its own argument.

First, there is no conduct or other objective indicia which would lead Teco to assume it had an implied license. *See* Hoffman Reply dec., ¶ 5. In fact, the clearest example of conduct indicating the contrary is the CDA. The CDA is undisputably the only signed agreement governing the relationship between the parties and the best indicator of what the parties intended their relationship to be. And the CDA explicitly denies that it creates a license or patent right:

> 6) No right or license under any patent application, patent or proprietary right is granted hereunder by implication **or otherwise** and no commercial obligation on the part of either party is intended or undertaken."

*See* Hoffman dec. (May 8, 2008), Exhibit A, ¶ 6.

Having signed the agreement on September 21, 2006, Teco is presumed to have read and understood the terms of the CDA. *See*, *e.g.*, *Jakobson Shipyard*, *Inc. v. Aetna Casualty and Surety Co.*, 775 F.Supp. 606, 613 (S.D.N.Y. 1991) ["It is axiomatic that the signer of a contract is presumed to have read and understood all he signs regardless of whether he actually examined the document."]. It is disingenuous now to claim an implied license when Teco knew up front that in the absence of another agreement, no license would be given.

Second, in the face of the very clear CDA, Teco tries to show an implied license. These claims fail because they are false. They include:

- An argument that "the parties *intended* that these materials [AntiCancer's kit and reader] be used for their mutual benefit *without limitation*." Teco Oppo. at 18, emphasis in original. This statement is false and directly contradicted by paragraph 2 of the CDA, which specified that the only allowed use of AntiCancer's kit and other confidential information was "the evaluation of the suitability of entering into a business relationship." *See* Hoffman dec. (May 8, 2008), Exhibit A, ¶ 2.

- A statement that "there is nothing in the record to suggest plaintiff ever restricted Teco's use of the Kit, or that it terminated the parties' joint venture discussions before the subject lawsuit was filed." Teco Oppo. at 18. Again, the CDA restricted on Teco's use of the kit. It forbade the parties from disclosing confidential information, including "inventions" and "techniques." With regard to the lack of evidence that AntiCancer terminated joint venture discussions, Teco is right, but only because it was Tong Chiah of Teco who telephoned AntiCancer in December of 2006 and told Li Tang that Teco was no longer interested in pursuing the joint venture (because according to Tong Chiah, the HA Kit did not work). *See* Hoffman dec. (May 8, 2008), ¶ 8; Hoffman Reply dec., ¶ 6.

- A statement that "[a]t the time of the alleged infringement, the parties were still **actively** pursuing the terms of this joint venture." Teco Oppo. at 18, emphasis added. Again, this is false. Teco ended discussions in December of 2006, and Teco's own employees admitted under oath that they were doing little to no work on the AntiCancer project after that date. Tong Chiah first testified that between November 2006 and June 2007, he worked on the AntiCancer project a mere two hours a week. *See* Deposition of Tong Chiah, attached to the Lawton Declaration as Exhibit M, p. 171: 9-18. Later in the deposition, Chiah admitted to doing no work on the project at all after April of 2007 (saying that the project had been turned over to "customer service"). Exhibit M, p. 176: 13-21. Two hours a week doesn't suggest that Teco was "actively" pursuing the venture.

While Teco attempts to argue that "Plaintiff's actions and conduct created the impression that a license was created," that isn't the case. Not only does Teco fail to offer even one example of documented, affirmative conduct which would create an implied

1  license, the CDA, the only executed document between the parties and drafted by Teco,
2  contradicts Teco's argument. It is evident from the CDA that the parties did not intend to
3  create a license, and no conduct from that moment on changed that or created an implied
4  license. *See* Hoffman Reply dec., ¶ 5.

5  V.  **BECAUSE NONE OF TECO'S INVENTORY OR PRODUCTS ON ITS WEBSITE LIST A PRICE, YET ARE OFFERED FOR SALE BY TECO, TECO'S FLYER**
6  **AND WEBSITE CONSTITUTED OFFERS TO SELL UNDER 35 U.S.C. § 271.**

7        Teco argues that its website posting and flyer were not offers to sell for the sole
8  reason that they did not contain pricing or sales information. Teco cites several court
9  decisions to this effect. It is merely an attempt to hide behind inapplicable case law.

10        The reason the case law in inapplicable here is because **none** of Teco's product
11  information on its website contains a price, not even in its PDF product catalog accessible
12  from the website. This is not atypical, either. Teco is a medical diagnostics company. In the
13  medical diagnostics field, it is standard industry practice to advertise products for sale on
14  websites without price terms. *See* Hoffman Reply dec., ¶ 7. This is especially true for
15  highly-specialized diagnostics kits like AntiCancer's HA Kit. *Id*. The price of such kits is
16  extremely variable due to factors like the country in which the kits are being sold and how
17  many kits a customer is buying. *Id*. Such variables can cause the price of a given kit to range
18  enormously. *Id*. Because of this, diagnostics companies do not list prices and instead
19  determine prices on a case-by-case basis. *Id*.

20        Thus, to apply Teco's authority to a specialized subset of businesses who do not rely
21  on price terms on their websites at all in offers to sell would be nonsensical. It would
22  essentially mean that no medical diagnostics company ever makes an offer to sell over the
23  internet when it displays them prominently in a product catalog accessible by potential
24  customers. This goes against common sense. It is immediately apparent upon visiting
25  Teco's website, www.tecodiag.com, that Teco is offering to sell a myriad of medical
26  diagnostic supplies, kits, and tests. The website also directs customers to contact Teco's
27  customer service department to obtain pricing information. In the absence of a clear price
28  term, this is an offer to sell because it points the potential customer to where pricing

1  information may be obtained.
2      Teco's website is a place where it offers to sell its products.  That Teco chooses, as
3  most all diagnostics companies do, not to display a price term cannot shield it from liability
4  for infringement.
5  VI.    CONCLUSION
6      For the foregoing reasons, this motion should be granted.  AntiCancer is entitled to
7  partial summary judgment on its first, second, third, fourth and fifth claims for relief against
8  Teco.

10  Dated: July 14, 2008                     LAWTON LAW FIRM

12                                         By:    s/Dan Lawton
                                               Dan Lawton
13                                                 Attorneys for Plaintiff AntiCancer, Inc.