1 | Dan Lawton (State Bar No. 127342)
Joseph C. Kracht (State Bar No. 228507)
2 | Matt Valenti (State Bar No. 253978)
LAWTON LAW FIRM
3 | 550 West C Street, Suite 1400
San Diego, CA  92101
4 | (619) 595-1370
(619) 595-1520 (Telefacsimile Number)
5 | dlawton@lawtonlaw.com (electronic mail)

6 | Attorneys for Plaintiff AntiCancer, Inc.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| ANTICANCER, INC., a California corporation, | Case No. 07CV2294L (BLM) |
|---|---|
| Plaintiff, | REPLY DECLARATION OF DAN LAWTON IN SUPPORT OF MOTION OF PLAINTIFF ANTICANCER, INC. FOR PARTIAL SUMMARY JUDGMENT OF PATENT INFRINGEMENT BY DEFENDANT TECO DIAGNOSTICS |
| v. | |
| TECO DIAGNOSTICS, a California corporation; KC CHEN, a natural person; TONG CHIAH, a natural person; JIAN YANG VAECHES, a natural person; and DOES 1-30, | |
| Defendants. | Date: July 21, 2008<br>Time: 10:30 a.m.<br>Place: Courtroom 14<br>Judge: Hon. M. James Lorenz |

I, Dan Lawton, declare:

    1.    I am a lawyer licensed to practice in this Court.  I am counsel of record to AntiCancer, Inc., plaintiff in this action.  If called upon to testify in court, I could and would testify competently thereto.

    2.    Exhibits L and M appended to this declaration are copies of excerpts of the transcripts of the depositions of  KC Chen and Tong Chiah of Teco Diagnostics, respectively.  Each copy is true and correct.

///

1 | I declare under the pains and penalties of perjury under the laws of the United States
2 | that the foregoing is true and correct, and that I have executed this Declaration this 14th day
3 | of July, 2008, at San Diego, California.

                                          s/ Dan Lawton
                                          Dan Lawton

# EXHIBIT "L"

```
 1   yet.  So we talk everything, any kind of possibility.
 2   Say, okay, your product, what kind of situation.  What
 3   is the strength of your product?  What is the weak of
 4   your product?  All different thing.  Okay?  And then
 5   Tong Chiah keep asking question.  I remember he keep
 6   asking about the homocysteine of AntiCancer.  And then I
 7   just listened.
 8            And at a certain point, I asked Dr. Hoffman, I
 9   said, can I -- because there's -- you know that in
10   November is Medica coming up.  Okay?  Can I use certain
11   of your information to make certain flier for -- for the
12   show?  And I think at that time he say -- say yes or no.
13   I think he say okay.  And then that's how all the first
14   time discussion.
15       Q    You think he said okay to what?
16       A    To say that -- to look into the market
17   potential for his product.
18       Q    Do you think he said okay to making a flier to
19   use at the Medica meeting?
20       A    I think he nodded head.
21       Q    I'm sorry?
22       A    I think he nodded head.
23       Q    He nodded his head?
24       A    Yeah.
25       Q    So by nodding his head, that indicated to you
```

Page 43

1  that he gave you permission?

2     A    No.  Because at that time, we have no contract

3  yet.  So my information -- what I get is he seems okay

4  for me.

5     Q    So you had no contract at that time?

6     A    Yeah.  We just first time met.

7     Q    So do you believe that you had permission at

8  that time to use AntiCancer's product in a flier at

9  Medica?

10    A    Because I am not say that I can use his

11 information, but I do ask him.  That's -- that's all.  I

12 ask him.

13    Q    Sir, it's a yes-or-no question:  Do you believe

14 that at the time, you had his permission to use

15 AntiCancer's products in a flier at the Medica meeting?

16         MR. BEHLE:  Do you understand the question?

17         THE WITNESS:  Can you repeat your question.

18         MR. VALENTI:  Could you read it back, please.

19         (Record read.)

20         MR. BEHLE:  And your question is limited to the

21 first meeting he had; is that true?

22         MR. VALENTI:  Correct.

23         MR. BEHLE:  Or is it something later?

24         All right.  He's asking about the very first

25 meeting.

Page 44

```
 1  BY MR. VALENTI:
 2      Q    The very first meeting.
 3      A    Yes.
 4      Q    You do believe that Dr. Hoffman gave you
 5  permission; is that correct?
 6      A    Yes.
 7      Q    And the permission was granted in the form of
 8  him nodding his head; is that correct?
 9      A    Yes.
10      Q    To the best of your recollection, what
11  statement did you say to him that caused him to nod his
12  head?
13      A    I told him that the Medica coming, can I
14  explore market potential for your product in
15  international market?
16      Q    And that's all you said?
17      A    Yes.
18      Q    Did you mention a flier?
19      A    I didn't.  I'm sorry.  I didn't say that.
20      Q    You didn't say "flier"?
21      A    Yeah.  Yeah.
22      Q    You didn't say anything about a flier, did you?
23      A    (No audible response.)
24      Q    You only asked him if he could explore the
25  market?
```

Page 45

1  Q   Dr. Hoffman said okay?

2  A   Yeah, I think so, he say okay.

3  Q   Earlier today, didn't you testify he nodded his
4  head?

5  A   Nodded his head or -- okay, I can't remember
6  now exactly.  Also, okay.  In that I want to buy ten
7  unit.  So that's -- to prove that he's okay or he won't
8  sell me ten unit of the small reader.  So that mean that
9  he allow me to sell -- allow me to test the market in
10 coming Medica.

11 Q   Did you use any of the --

12 A   We never receive any -- I mean, you know, or
13 else we never receive -- you cannot use it.  You cannot
14 use this information.  You cannot use this information.

15 Q   You mean AntiCancer never told you --

16 A   Yeah.

17 Q   -- which information --

18 A   Yeah.

19 Q   -- was confidential and which wasn't?

20 A   Yeah.

21 Q   How would you determine what was confidential
22 and what was not?

23 A   No.  He never revealed to me, said, okay, you
24 are not create the flier, which is against --

25 Q   I'm sorry.  Can you repeat that.

Page 151

1  ask you what that agreement specifically entailed.
2         And part of what I'm asking you is if that
3  agreement, in your mind, meant that you could test
4  market AntiCancer's products in any way you chose.
5         Is that correct?
6         MR. BEHLE:  Assumes facts not in evidence.
7         He's asking you if you perceived any limitation
8  on what you could do to test market.
9         THE WITNESS:  Any limitation, no.
10 BY MR. VALENTI:
11    Q    No limitation?  You could test market any way
12 you chose; is that correct?
13    A    (No audible response.)
14    Q    I'm sorry, sir?
15    A    I should say yes.
16    Q    And you took that from the head nod or the
17 "okay," is that correct, that's the only indication that
18 gave you that?
19    A    Yes.  Yes.
20    Q    And that head nod or that "okay" also indicated
21 to you that you could do anything you wanted to test
22 market unless Dr. Hoffman objected; is that correct?
23    A    I should say yes.
24    Q    And you never received any kind of objection
25 from Dr. Hoffman, excepting the lawsuit; is that

Page 240

# EXHIBIT "M"

```
 1  that you had permission from AntiCancer to premarket its
 2  products; correct?
 3       A    Correct.
 4       Q    And then you told me, or I believe you told me,
 5  that you continued to premarket AntiCancer's products
 6  after November 2006 and all the way up until June 2007;
 7  correct?
 8       A    Yes.
 9       Q    So how much time did you put into premarketing
10  AntiCancer's products during that time period?
11            MR. BEHLE:  As opposed to all Homocysteine?
12  That's your question?
13            THE WITNESS:  Yeah.
14  BY MR. VALENTI:
15       Q    Sure.
16       A    Probably less than two hours.
17       Q    Two hours a week?
18       A    Two -- yeah.
19       Q    So approximately eight hours a month?
20       A    Yes.
21       Q    So you were working about eight hours a month
22  on a project with a company that you, at that time, had
23  no contact with; correct?
24       A    Yes.
25       Q    Did that seem to you a valuable use of your
```

Page 171

| | | |
|---|---|---|
| 1 | A | I believe they are not ready. |
| 2 | Q | And after three or four months of them not |
| 3 | calling you back, did you begin to have doubts? | |
| 4 | A | No. |
| 5 | Q | After four or five months, did you begin to |
| 6 | have doubts? | |
| 7 | A | I -- I was -- I was handling a project until |
| 8 | the end of April.  Then I was transferred to the other | |
| 9 | project. | |
| 10 | Q | So in April, you -- it -- it was off your |
| 11 | plate; is that correct? | |
| 12 | A | Yes. |
| 13 | Q | So after April, you -- you didn't do any work |
| 14 | on it at all? | |
| 15 | A | Yes. |
| 16 | Q | Who was assigned to pick up where you left off? |
| 17 | A | The project basically was turned to the |
| 18 | customer service, and the -- the marketing material was | |
| 19 | already out and wait for the reply and the feedback. | |
| 20 | The existing order of Homocysteine is still ongoing, so | |
| 21 | that is how the -- the operation's still ongoing. | |
| 22 | Q | And who is the person in charge of doing that? |
| 23 | A | That would be Marshall, a guy -- a gentleman |
| 24 | called Marshall. | |
| 25 | Q | Can you spell that. |

Page 176